

# Fourth Court of Appeals

### San Antonio, Texas

## MEMORANDUM OPINION

No. 04-24-00684-CV

**TEXAS HEALTH AND HUMAN SERVICES COMMISSION**,
Appellant

v.

Virginia **RODRIGUEZ**,
Appellee

From the 198th Judicial District Court, Kerr County, Texas
Trial Court No. 21492B
Honorable M. Patrick Maguire, Judge Presiding

Opinion by: Velia J. Meza, Justice

Sitting: Rebeca C. Martinez, Chief Justice
Lori Massey Brissette, Justice
Velia J. Meza, Justice

Delivered and Filed: July 2, 2025

REVERSED AND RENDERED

The Texas Health and Human Services Commission (HHSC) appeals the trial court's denial of its plea to the jurisdiction in a lawsuit filed by Virginia Rodriguez, in which she alleges disability discrimination and retaliation for reporting age discrimination under Chapter 21 of the Texas Labor Code. We reverse and render judgment dismissing the underlying lawsuit for lack of jurisdiction.

## BACKGROUND

Virginia Rodriguez joined HHSC to work as a psychiatric nurse aide at Kerrville State Hospital in February 2013, where she assisted patients with daily living needs. After a year of employment, she applied for and obtained a rehab tech position, where her duties required escorting patients to various activities on hospital grounds, facilitating social interactions, helping teach current events, and assisting with outdoor walks and indoor physical exercise.

Rodriguez unsuccessfully applied for a rehab teacher position several times. In May 2019, she applied a final time and was, again, not selected. Rodriguez claimed that the chosen candidate allegedly outscored her by "54 points," which led her to suspect irregularities and prompted her to file a complaint of discrimination. On June 14, 2019, Rodriguez filed an internal complaint with the HHSC Civil Rights Office alleging that her supervisors, Debbie Isely and M'Joyce Kasberg, discriminated against her due to race, sex, and age.

During the investigation, Kasberg explained she did not choose Rodriguez for the position because she was not the highest scoring applicant in a pool of very competitive applicants. Kasberg claimed that she tried to explain the results to Rodriguez, but she was not receptive. Isely explained that she worked with Rodriguez to help her prepare for the interview. While Rodriguez admittedly did better in her interview, four other applicants scored higher than Rodriguez's interview score.[1] Both Kasberg and Isely denied they discriminated against Rodriguez, and instead, explained they chose the highest scoring applicant. Additionally, the investigator noted that a side-by-side comparison of Rodriguez and the selectee's scores, showed no obvious discrepancies between the applicants.

---

[1] The person selected for the job scored exactly 50 points higher than Rodriguez.

On September 19, 2019, Rodriguez received the results of her civil rights complaint. The investigator found no evidence to substantiate discrimination based on race, age, or sex.

Following her complaint, Rodriguez believed other employees treated her differently. She claimed employees from outside her rehab unit stopped speaking to her, "they didn't speak, they weren't friendly as previously." Rodriguez also claimed she was called into Isely's office more often for employee complaints against her. She explained that when she reported to work, she called the secretary's office to check in for the day. Rodriguez described that "many mornings . . . I was advised I was wanted down in Debbie Isley's office." While Rodriguez generally described she was "accused of stuff" that was "not true," she never reported this perceived negative change of behavior by other employees. Rodriguez alleged that her supervisors "never produce[d] any of the individuals" and that getting called into the office became, "almost a daily thing." Rodriguez categorized the employee complaints against her as either "talking ugly to somebody on the phone," or "rolling eyes."

Although Rodriguez admitted she had no proof any colleagues were aware of her civil rights complaint or that they altered their behavior because of it, she believed the timing of their change in conduct suggested retaliation. However, in her formal civil rights complaint, Rodriguez did not include any allegations of retaliation by employees.

On January 7, 2021, after a series of complaints about Rodriguez's workplace conduct and interventions by supervisory staff, Rodriguez was terminated. The following day, Rodriguez filed a charge of discrimination with the Texas Workforce Commission Civil Rights Division. The U.S. Equal Employment Opportunity Commission issued a Dismissal and Notice of Rights stating the EEOC would not continue with the investigation and made no other determinations on the claims of discrimination.

Rodriguez filed a petition against HHSC alleging unlawful employment practices in violation of the Texas Labor Code. HHSC filed a plea to the jurisdiction, which the trial court denied. HHSC appeals that denial. *See* TEX. CIV. PRAC. & REM. CODE § 51.014(a)(8) (authorizing interlocutory appeal from denial of a plea to the jurisdiction by state agency).

## DISCUSSION

Because HHSC is a state agency, "it is immune from suit absent an express legislative waiver." *Tex. Tech Univ. Health Scis. Ctr.-El Paso v. Flores*, 709 S.W.3d 500, 504 (Tex. 2024). The Texas Commission on Human Rights Act (TCHRA)—codified as Chapter 21 of the Labor Code—prohibits an employer from discriminating against an individual because of certain characteristics. TEX. LAB. CODE § 21.051. As a complement to its anti-discrimination provisions, the Act also prohibits retaliation against employees for engaging in protected activities—such as reporting age discrimination, as alleged in this case. A retaliation claim under the TCHRA can still be viable even if the underlying discrimination claim is not.

Because the definition of "employer" under the Act includes a "state agency" and other governmental entities, the Texas Supreme Court has interpreted the TCHRA to "clearly and unambiguously" waive sovereign and governmental immunity. *Mission Consol. Indep. Sch. Dist. v. Garcia*, 253 S.W.3d 653, 660 (Tex. 2008). To establish such a waiver, a plaintiff must allege facts that would establish a violation of the Act and, when challenged with contrary evidence, provide evidence that is sufficient to create a genuine issue of material fact as to the allegation. *Flores*, 709 S.W.3d at 505.

"Before a case is tried on the merits, and in the absence of direct evidence of discrimination, we use the *McDonnell Douglas* burden-shifting framework to evaluate whether a plaintiff has created a fact issue." *Id*. (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973)).

Under that framework, (1) the plaintiff must create a presumption of illegal discrimination by establishing a prima facie case; (2) the defendant must then rebut that presumption by establishing a legitimate, nondiscriminatory reason for the employment action; and (3) the plaintiff must then overcome the rebuttal evidence by establishing that the defendant's stated reason is a mere pretext. *Id*.

In reviewing the trial court's ruling on HHSC's plea to the jurisdiction, "we assume the evidence supporting the plaintiff's allegations is true, resolving all doubts and indulging reasonable inferences in the plaintiff's favor." *Id*. "In doing so, however, we cannot disregard evidence necessary to show context, and we cannot disregard evidence and inferences unfavorable to the plaintiff if reasonable jurors could not." *Alamo Heights Indep. Sch. Dist. v. Clark*, 544 S.W.3d 755, 771 (Tex. 2018).

## 1    Retaliation

We begin by analyzing Rodriguez's retaliation claim. To establish a prima facie case of employment discrimination, a plaintiff must demonstrate: (1) participation in an activity protected by the TCHRA, (2) a material adverse employment action, and (3) a causal link between the protected activity and the adverse action. *See Alamo Heights*, 544 S.W. 3d at 790. A plaintiff "need only show a minimal causal link between the protected activity and the adverse action" to establish a prima facie case. *Id*. at 789. However, that causal link must show that "but for" an employee engaging in protected conduct, the employer's prohibited conduct "would not have occurred when it did." *See Tex. Dep't of Human Srvcs. v. Hinds,* 904 S.W. 2d 629, 636 (Tex. 1995). [2] The *Hinds* court reasoned that but-for causation "best protects employees from unlawful retaliation without

---

[2] *See also Pineda v. United Parcel Serv., Inc.,* 360 F. 3d 483, 488-489 (5th Cir. 2004) ("Therefore, a plaintiff asserting a retaliation claim must establish that without his protected activity, the employer's prohibited conduct would not have occurred when it did.") (cleaned up).

punishing employers for legitimately sanctioning misconduct or harboring bad motives never acted upon." *Id*. (quoting *Mt. Healthy City Sch. Dist. Bd. Of Educ. v. Doyle*, 429 U.S. 274, 285–286 (1977)).

The Texas Supreme Court reiterated in 2020 that an adverse employment action "based solely" on reasons unrelated to a good-faith report of a legal violation destroys the causal link. *See Office of the Attorney General v. Rodriguez*, 605 S.W. 3d 183, 192 (Tex. 2020); *See also City of Fort Worth v. Zimlich*, 29 S.W.3d 62, 67 (Tex. 2000) (explaining that the employee must demonstrate that the adverse personnel action "would not have occurred when it did if the employee had not reported the illegal conduct" (citing *Hinds*, 904 S.W.2d at 633)).

In 2021, the Texas Supreme Court provided further clarification on the role the various factors play when the evidence indicates that an employer acted against an employee for a legitimate reason unrelated to the employee's protected conduct. *See Apache Corporation v. Davis,* 627 S.W. 3d 324, 326 (Tex. 2021). The court explained that while it utilized the factors in *City of Fort Worth v. Zimlich, Alamo Heights, and Rodriguez*, those factors do not replace the *Hinds* standard. *See id.*

Importantly, the focus of the analysis is on the employer's actions, rather than those of other employees who are not involved in the decision-making process. *See, e.g., Harris County v. Vernagallo*, 181 S.W.3d 17, 25–26 (Tex. App.—Houston [14th Dist.] 2005, pet. denied) (basing employer's liability on motives of employee who had "the authority to hire and fire without consulting any other person or board" and who "took the adverse employment action"); *Gee v. Principi*, 289 F.3d 342, 346 (5th Cir. 2002) (explaining that courts focus "on the final decisionmaker" because the "statements and actions of ordinary employees are normally not imputable to the employer").

**1.1 The evidence presented shows Rodriguez was terminated for conduct unrelated to her civil rights complaint.**

The evidence of Rodriguez's decline in her workplace conduct is uncontradicted. A considerable number of complaints were filed by other employees at the hospital about Rodriguez's conduct. For instance, on January 16, 2020, her supervisors received complaints that Rodriguez had yelled and hung up on staff members, was exhibiting bullying and threatening behavior with staff and patients, and was overall, short tempered. When the supervisors spoke to Rodriguez about these complaints, she became upset and asked to leave the meeting stating it was "too much" for her to "deal with." The supervisors counseled her on being more courteous, professional, and polite with patients and staff.

On March 27, 2020, Rodriguez sent a text message to Kasberg where she requested to leave at noon on March 30, 2020, to take flowers to her brother's grave, and "just spend time there." Rodriguez did not provide other details in the text message requesting leave. Kasberg responded that due to the pandemic, it was important that the hospital have all the staff present as scheduled. However, Kasberg was willing to negotiate a later time for Rodriguez to leave that day and offered to allow her to leave by 3:00 p.m. Rodriguez declined saying it was "too late." On March 31, 2020, Rodriguez sent an email to her supervisors, copying the superintendent of the Kerrville State Hospital, to express her frustration over their decision not to approve her request to attend a family grave site gathering at 2:00 p.m. However, Rodriguez was later counseled for not fully providing the context of her communications, which led to concerns about the email's lack of honesty.

In May 2020, Rodriguez was counseled for incorrectly entering sick leave instead of annual leave in the state's time accounting system. She had initially requested time off for the Friday and Tuesday surrounding Memorial Day weekend but later withdrew the request. However, she did not report to work on those days and instead used sick leave. When questioned, Rodriguez stated

she was unaware that donated sick leave could not be used in place of annual leave. She was warned that any future errors in leave input could result in disciplinary action.

In August 2020, Rodriguez was counseled for an incident the prior month where a patient repeatedly cursed at Rodriguez. She told the patient that if he talked to people outside the hospital in that way he would get likely get beat up or end up in jail. A doctor at the hospital intervened and tried to explain to Rodriguez that her handling of the situation was not the best given that the patient suffered from a severe mental health disorder and was borderline intellectual functioning. Rodriguez was dismissive and claimed she knew how to work with the patient population. Immediately thereafter, Kasberg issued Rodriguez a written warning for inappropriate conduct with staff and patients.

That written warning would remain open for six months from August 24, 2020 until February 24, 2021.[3] The warning clearly outlined the work rules violated, that it would be part of Rodriguez's permanent personnel file, that she would be ineligible for certain benefits during the effective period, and most importantly, that failure or unwillingness to improve would result in further disciplinary action.

In October 2020, Rodriguez was admonished once again for inaccuracies in her timekeeping, specifically for taking sick leave for doctor appointments without providing proof. Over the previous two months, she had taken four days of sick leave without first notifying her employer. When questioned, Rodriguez explained that two of those days were for "mental health" purposes and claimed she was unaware that donated sick leave could not be used for that, despite having previously been counseled on its proper use.

On October 29, 2020, Rodriguez was counseled for allowing a patient to participate in a

---

[3] Rodriguez was ultimately terminated during this period.

work program for more hours than allowed under the hospital policy. Even though her supervisor asked her not to do so, Rodriguez persisted causing confusion in the unit.

Finally, on December 22, 2020, Ginny Staton, a newly appointed Rehab Teacher III, raised concerns about Rodriguez's behavior while working alongside her. Previously, another teacher had requested a transfer, citing difficulties in working with Rodriguez.

In this instance, Staton observed that Rodriguez mistakenly believed she held authority over her, failed to consider Staton in planning patient activities, openly opposed Staton's suggestions for patient engagement, and refused to implement Staton's planned activities. Additionally, supervisors noted that Rodriguez regularly canceled outdoor recreation for patients—depriving them of crucial outdoor time—and often pressured or intimidated staff into supporting these cancellations. Before escalating the issue to supervisors, Staton addressed her concerns directly with Rodriguez and they mutually agreed to collaborate more effectively moving forward. Staton left the meeting feeling optimistic, believing they had reached an understanding. However, Rodriguez perceived the meeting quite differently and went straight to her supervisors.

On December 22, 2020, Rodriguez met with Kasberg and Joshua Kulick, her supervisors at the time. During the meeting, Rodriguez expressed Staton was lazy, didn't know what she was doing, and didn't do enough for the patients. Rodriguez explained she could not do more activities with the patients because of her diabetes and anxiety issues. She reiterated all the staff complaints about her were untrue and unfair. Rodriguez complained she was assigned to work with "soft-spoken easy-going" staff members, and she was simply a "rough talker."

As the discussion continued, Rodriguez became extremely distressed, started crying and yelling, and requested reassignment. She also expressed her unwillingness to continue working with Staton. Rodriguez stated she could not continue doing her job because of her anxiety and

diabetes and that "the job was killing her." In response, her supervisors encouraged her to take the next day off and rest, as her next scheduled workday was January 4, 2021. Following the meeting, Rodriguez sent a message to her supervisor, detailing the emotional toll of the conversation. In her message, she described feeling so sick that she vomited in her truck and couldn't see straight.

Rodriguez also told her supervisor that she left for the day and did not lock the cabinet where scissors and other sharp items are stored because she couldn't find the lock. Rodriguez not locking the cabinet was not only a violation of the workplace rules, but it also presented a safety issue to the hospital because some staff allow patients in there with limited supervision.

After the meeting, Rodriguez's supervisors called the HR representative, David Sifuentes, to seek guidance on the events of that day. Sifuentes directed Kulick to email Rodriguez a Reasonable Accommodations Request Form. (HR 1602)

During her deposition, Rodriguez admitted that she chose not to fill out the form because she had not requested an accommodation. While Rodriguez acknowledged telling Kulick that stress had aggravated her anxiety and diabetes, she maintains that she only requested a transfer out of the unit. During her deposition, Rodriguez confirmed that she experienced "anxiety" but did not have an "anxiety disorder." In her view, an anxiety disorder was a more persistent "mental issue," whereas the anxiety she experienced during the meeting stemmed from "all the stress and retaliation" she faced during her employment with HHSC.

Rodriguez stated that the reasonable accommodation form was the only instance during her tenure at HHSC in which she believed she was discriminated against based on a perceived disability or regarded as disabled. In response, Kulick stated he never diagnosed Rodriguez with a mental illness, never formed an opinion that Rodriguez was disabled, and that he simply sent the form as he was instructed by HR. Kulick's recommendation to terminate Rodriguez was based on

a documented pattern of unprofessional behavior with both patients and staff, and completely unrelated to the civil rights complaint of 2019.

On January 4, 2021, after consulting with HR, Rodriguez's supervisors determined that issuing a Disciplinary Action Notice (DAN) was the appropriate course of action. During the meeting, Rodriguez refused to sign the DAN, asserting that the complaints against her were unfounded and the allegations were unfair. Rodriguez maintained that no changes to her behavior were necessary. Instead, Rodriguez elected to submit a written rebuttal. On January 7, 2021, she sent her response to her supervisors, reiterating her belief that she was being retaliated against for filing a civil rights complaint in 2019.

After reviewing Rodriguez's rebuttal, Kasberg notified her in writing on January 8, 2021, that her employment would be terminated. In her sworn declaration, Kasberg explained that her decision to terminate Rodriguez was based on a gradual decline in Rodriguez's workplace conduct. Over time, her behavior raised serious concerns regarding her interactions with both staff and patients at the hospital.

**1.2    Rodriguez did not prove a prima facie case of retaliation.**

Rodriguez was required to prove that but for her civil rights complaint, she would not have been terminated. *Apache Corp. v. Davis*, 627 S.W.3d 324, 339 (Tex. 2021). Instead, she offered only speculation and conclusory statements as to the basis of her termination.

Rodriguez engaged in inappropriate and unprofessional conduct over a significant period, was given ample opportunity to modify her conduct, and was terminated after refusing to modify her conduct. Due to the significant passage of time between her civil rights complaint and the adverse action, and the complete lack of evidence showing a retaliatory purpose, Rodriguez has not shown even a minimal causal link sufficient to establish a prima facie case of retaliation. *See*

*Alamo Heights*, 544 S.W. 3d at 789. Accordingly, Rodriguez has not shown a valid waiver of immunity as to her retaliation claim.

**2    Disability Discrimination.**

Chapter 21 of the Texas Labor Code prohibits employers from discharging employees because of a disability. TEX. LAB. CODE § 21.051. Under the statute, "disability" is defined as a "mental or physical impairment that substantially limits at least one major life activity, a record of such an impairment, or being regarded as having such an impairment." *Id*. § 21.002(6). Thus, to assert a disability-discrimination claim under the Labor Code, a plaintiff may argue she actually has an impairment and was discriminated against due to that impairment; or that her employer perceived her as having an impairment and discriminated against her based on that perception. *See Tex. Tech Univ. Health Scis. Ctr.–El Paso v. Niehay*, 671 S.W.3d 929, 935 (Tex. 2023).

To succeed on a disability-based discrimination claim, Rodriguez must establish, among other elements, that HHSC recognized her as disabled or that she asserted a disability. Rodriguez points to a sole instance where, she alleges, her supervisor regarded her as disabled and no instance where she asserted any disability: the reasonable accommodation form she received on December 23, 2020. Specifically, she testified Kulick improperly diagnosed her with anxiety disorder and included it in the DANS. During her deposition, Rodriguez admitted that she chose not to complete the reasonable accommodation form, as she had never requested an accommodation. While she acknowledged telling Kulick that stress had exacerbated her anxiety and diabetes, she maintained that her sole request was a transfer out of the unit.

Rodriguez further stated that, while she experienced anxiety, she did not have an anxiety *disorder*. In her view, an anxiety disorder is a more persistent "mental issue," whereas the anxiety she felt during the meeting stemmed solely from "all the stress and retaliation" she faced at HHSC.

In doing so, she effectively foreclosed any assertion that she suffered from a mental "impairment that substantially limits at least one major life activity."[4]

Rodriguez adamantly rejected any characterization of her diabetes as a disability when asserting her claims. She maintained that, despite having the condition, it did not substantially limit a major life activity and, therefore, did not meet the legal definition of a disability under the applicable framework.[5]

---

[4] Counsel for HHSC elicited the following deposition testimony regarding Rodriguez's anxiety claim:

Q. Okay. Why-what do you believe led him to put that on the DANS letter?

A. I want to say It was around December 23rd I went in to speak to actually M'Joyce, but she was in Josh's office, so I spoke to both of them. At that time, I had a severe anxiety attack, and M'Joyce told me to go on home. So I'm assuming because he witnessed an anxiety attack that he decided to diagnose me.

Q. Have you been diagnosed by a medical professional for any anxiety?

A. Anxiety. Not anxiety disorder.

Q. And in your opinion, anxiety and anxiety disorder are different things?

A. Yes, ma'am.

Q. How are they different?

A. My anxiety was due to all the stress and retaliation I was going through during my employment with them. Anxiety disorder to me it's like an ongoing mental issue.

Q. How long had you been suffering from anxiety?

A. It's off and on throughout the years. If I lose a loved one, I go through a hard time.

[5] And in response to questioning by counsel for HHSC, Rodriguez answered the following regarding her diabetes claim:

Q. And so how - how were you discriminated against because of your diabetic condition?

A. Well, after meeting with Mr. Kulick and M'Joyce Kasberg I was told to take the next day off of work, and Josh Kulick decided to - well, he phoned me and asked for my personal email and sent me a - told me he was sending me a form to fill out on reasonable accommodations, which I never requested for.

Q. You never requested any-

A. No, ma'am.

Q. Let me finish my question.

A. Oh, sorry.

Q. You never requested any accommodation?

A. No, ma'am.

Q. Is this the first time that you've - the December 23rd interaction, is that the first time you felt you were discriminated against because of your diabetic condition?

A. Yes, ma'am.

Q. -So you don't- as you sit here today, you don't feel like HHSC or any of its employees ever discriminated against you prior to around December 23rd of 2020 for your diabetic condition?

Kulick, in his response, emphasized that he never diagnosed Rodriguez with a mental illness, never considered her disabled, and merely sent the form as instructed by HR. He further stated that his recommendation to terminate Rodriguez was based on a documented pattern of unprofessional behavior toward both patients and staff.

Further, plaintiffs pursuing a regarded-as disability claim are not required to present evidence that the perceived impairment "substantially limits at least one major life activity." *Niehay*, 671 S.W.3d at 936 n.17. Thus, Rodriguez bore the burden of establishing a fact issue as to whether HHSC regarded her as impaired—regardless of whether she was actually impaired and regardless of whether the impairment substantially limited a major life activity. *Id.* at 935.

## 2.1  Rodriguez failed to raise a fact issue regarding her disability claim.

Rodriguez never asked for an accommodation for any disability. When asked to complete the initial accommodation request, based on her being highly distressed, crying, and yelling at her supervisors during the December 22, 2020, meeting, Rodriguez refused, repeatedly stating that she did not suffer from an "anxiety disorder." Rodriguez simply wanted to be transferred out of her unit.

---

A. No, ma'am.

Q. Do you consider yourself to be disabled due to your diabetic condition?

A. No, ma'am.

Q. And the perception that you had an anxiety disorder, do you-feel that you were discriminated against based on that perception prior to or before that interaction with Josh and M'Joyce in December of 2020?

A. No, ma'am.

Q. So that was the first time that you believe you were discriminated against because of a perceived disability of having an anxiety disorder?

A. Yes, ma'am.

After her termination, Rodriguez shifted her position. On the same day she was terminated, Rodriguez filed her discrimination claim and added that she was discriminated based on a disability.

But Rodriguez's change in position could not have influenced HHSC's prior decision to terminate Rodriguez. Numerous internal communications were produced during discovery and indeed Rodriguez's deposition itself, yet none indicate that HHSC regarded Rodriguez as disabled, contrary to her own conclusory statements. Rodriguez has failed to establish a fact issue regarding her claim of disability discrimination.

## CONCLUSION

We hold that Rodriguez has failed to make a prima facie case of retaliation and disability-based discrimination. Absent a valid waiver of sovereign immunity under the THCRA, the trial court lacked subject matter jurisdiction and the plea to the jurisdiction should have been granted. *Flores*, 709 S.W.3d at 504. Accordingly, we reverse and render judgment dismissing the case for lack of jurisdiction.

Velia J. Meza, Justice